Michael J. CULHANE and Edith MILLWOOD *v.* STATE of ARKANSAS and CITY OF FAYETTEVILLE

CR 83-158                                         668 S.W.2d 24

Supreme Court of Arkansas
Opinion delivered April 30, 1984
[Rehearing denied June 4, 1984.*]

*PURTLE, J., would grant rehearing.

*Pearson, Woodruff & Evans,* by: *C. Thomas Pearson, Jr.,* for appellants.

*Steve Clark,* Atty. Gen., by: *Alice Ann Burns,* Dep. Atty. Gen., for appellees.

GEORGE ROSE SMITH, Justice. The two appellants, Michael J. Culhane and Edith Millwood, employees of a K-Mart discount store in Springdale, were arrested and charged with a misdemeanor for refusing to leave a Wal-Mart discount store in Springdale after being asked by the store manager to leave. Ark. Stat. Ann. § 71-1803 (Repl. 1979). From their convictions in municipal court they appealed to the circuit court, where they were found guilty and fined $50 each. Their present appeal comes to us under Rule 29 (1) (a) and (c).

As will be seen from the fact, the real dispute is between K-Mart and Wal-Mart. It concerns their rival methods of determining each other's prices. Both sides agree that comparison shopping is a common practice among retail stores in the area. Wal-Mart has a written rule, posted in its Springdale store, that comparison shoppers for competitors will be asked to leave the store if they attempt to write down Wal-Mart prices. K-Mart apparently does not have such a policy and permits its prices to be written down.

There was proof that one method of comparison shopping is for the shopper to go into a store, memorize a few prices, go outside and write them down, and continue that maneuver again and again. Wal-Mart has no objection to that procedure. On the day of the arrest, however, the two K-Mart employees went into the Wal-Mart store with clipboards and began writing down prices. They were not creating any sort of disturbance. When they refused to leave, the store manager called the Wal-Mart general office and was instructed to enforce the company's policy. When the two shoppers again refused to leave, a police officer was called, who explained that he would have to give them a citation for violating the law if they did not leave. The two maintained their position and were arrested. A test case was apparently being made, for the two told the store manager that if they had to go to court they would inform the news media, which they did.

The appellants, in seeking to avoid the application of the statute to their case, make three arguments. We first quote the language of the statute:

Any person who enters a public place of business in this State, or upon the premises thereof, and is requested or ordered to leave therefrom by the owner, manager, or any employee thereof, and after having been so requested or ordered to leave, refuses so to do, shall be guilty of a trespass [and subject to certain penalties]. Section 71-1803.

It is first argued that the statute was impliedly repealed by Section 2004 of the 1975 Criminal Code, which reads: "A

person commits criminal trespass if he purposefully enters or remains unlawfully in or upon a vehicle or the premises of another person." Ark. Stat. Ann. § 41-2004 (Repl 1977). The Code section, however, is a general statute encompassing many possible situations; the statute now in question is specific, applying to only one situation. In such a case a general law does not impliedly repeal the specific law unless there is a plain conflict between the two. *Winston v. Robinson and State,* 270 Ark. 996, 606 S.W.2d 757 (1980). Here we discern no such conflict. Quite the contrary, the earlier statute might have been incorporated in the Criminal Code without any inconsistency or any doubt about the legislative intent.

The appellants' second point, their principal one, is that the statute is so overly broad that it violates the First and Fourteenth Amendment, because it *may* interfere with federally protected rights. It is argued that the law *might* be used to discriminate among a store's customers on the basis, say, of race or religion.

That argument in this instance is fanciful, not realistic. We are not dealing with attempted discrimination. The real parties in interest are K-Mart and Wal-Mart; the statute applies alike to both of them. The possibility of true discrimination in commercial establishments was dealt with by Congress in the Civil Rights Act of 1964, which prohibits discrimination or segregation on the ground of race, color, religion, or national origin. That law could not apply here, however, because it is specifically limited to certain types of establishment, including lodging places, eating places, and places of entertainment. 42 USCA § 2000a (1981). To the extent that the federal law does apply, of course it supersedes conflicting state statues. *Hamm v. City of Rock Hill,* 379 U.S. 306 (1964).

It is argued, however, that our statute *might* be used as a tool restricting someone's constitutional rights. That, however, is true of many criminal laws. We have, for example, a statute that applies only to stores and creates a presumption of shoplifting when a person conceals unpurchased merchandise. Section 41-2202 (2). Perhaps that

law could be used in a selective and discriminatory manner by a storekeeper, but that possibility does not invalidate the statute.

We considered a similar contention in *State* v. *Weston*, 255 Ark. 567, 501 S.W. 2d 622 (1973), where it was argued that our statutory definition of criminal libel was so lacking in precision, so overbroad, as to be unconstitutional. What we said there is pertinent here:

> Counsel for the appellee do not suggest in their brief any definition of libel that would, in their opinion, withstand an attack based upon the First Amendment. The formulation of such a definition could hardly give effect to the intention of the legislature. That is, the more precise and inflexible the definition becomes, as by making it a libel to falsely charge another with being a liar or a thief, the more likely it is that the statutory language would fail to encompass many, many instances of slightly different language that the legislature would also make punishable if it were practical to do so. Thus the alternative to the general language now contained in the statute would be an enactment so specific that it would necessarily discriminate between utterances so similar as to be equally culpable.

What the appellants ignore is the fact that K-Mart and Wal-Mart both have private property rights that are being protected by the statute. The Supreme Court's latest decision on this point is persuasive. *Lloyd Corp.* v. *Tanner*, 407 U.S. 551 (1972). There the Lloyd company owned a huge enclosed center or mall that contained many stores, sidewalks, parking facilities, and other components that made the mall far more like a public place than is a single store such as a Wal-Mart. On that basis the plaintiffs brought an action for a declaratory judgment to sustain their asserted right to distribute within the center handbills protesting the draft and the Vietnam war, even though all handbilling was prohibited by Lloyd. The Court upheld the prohibition, saying:

Respondents' argument, even if otherwise meri-
torious, misapprehends the scope of the invitation
extended to the public. The invitation is to come to the
Center to do business with the tenants. . . . There is no
open-ended invitation to the public to use the Center
for any and all purposes, however incompatible with
the interests of both the stores and the shoppers whom
they serve.

In the same way, Wal-Mart invites the public to come to its
store to shop and make purchases. The *Lloyd* case means
that Wal-Mart could prohibit a person from exercising in its
store what would be a protected right of free speech if
asserted on a public sidewalk. That being true, Wal-Mart
certainly can prohibit a competitor from remaining in the
store not to enjoy a constitutional right but solely to gather
information enabling the competitor to take business away
from Wal-Mart.

A third argument, closely related to the second, is that
K-Mart's comparison shoppers were exercising their con-
stitutional right to receive information. On this point their
brief asserts that the First Amendment guarantees their
position, as a matter of free speech: "That is, because the
commercial speech to be received is the price of the items as
posted in the store, the only place the right can be exercised is
on the property. Criminal prosecution of the appellants for
assertion of the right is not merely an abridgement of the
right, it is a total extinguishment."

This argument fails to recognize the basic premise that
the right to receive information is properly invoked when
the public would otherwise be denied those benefits of free
communication that are embedded in the First Amendment.
In the principal case recognizing the right to receive
information, the Supreme Court relied upon that right as a
basis for striking down a state law that made it unpro-
fessional conduct for a pharmacist to advertise the prices of
prescription drugs. *Virginia State Bd. of Pharmacy* v.
*Virginia Citizens Consumer Council,* 425 U.S. 748 (1976).
K-Mart, however, is not seeking to gain information that
would otherwise be denied to the consumer; Wal-Mart's

prices, like K-Mart's own prices, are posted for everyone to see. K-Mart is obviously not attempting to protect the public, only to further its own competitive position in the market. It can, however, neutralize any advantage that Wal-Mart gains from the statute by adopting an identical policy in its own stores.

Affirmed.

HAYS, J., concurs.

HICKMAN, PURTLE, and HOLLINGSWORTH, JJ., dissent.

DARRELL HICKMAN, Justice, dissenting. This is essentially a commercial struggle between two giant discount stores. But what is involved is more than their merchandising practices; what actually is involved is a statute which allows a proprietor to make a person guilty of a crime for doing nothing offensive.

The statute in question was passed in the early days of racial turmoil when stores were being challenged for discrimination. It permits a person to be ejected from an establishment for any reason, or no reason. The failure to obey an order to leave becomes a criminal act. The statute is altogether too vague to satisfy the usual constitutional requirements for criminal conduct. An invitee to a business cannot be held guilty of criminal trespass for no reason, and that is essentially what this statute permits. Such vague statutes have routinely been stricken. *Brown v. Louisiana,* 383 U.S. 131 (1969) (public library); *Cox v. Louisiana,* 379 U.S. 536 (1965) (picketing in front of store); *Shuttlesworth v. Birmingham,* 382 U.S. 87 (1965) (demonstrating on a public street). Admittedly, those cases all relate to public areas rather than private businesses open to the public, and that is a valid distinction. But the court said in *Shuttlesworth, supra:*

> That ordinance makes it a criminal offense for any person 'to refuse or fail to comply with any lawful order, signal or direction of a police officer.' Like the provisions of § 1142 discussed above, the literal terms

of this ordinance are so broad as to evoke constitutional doubts of the utmost gravity.

Even so, in this case the statute permits a proprietor to make one guilty of criminal trespass when he is not. Regarding criminal trespass, 75 Am. Jur. 2d *Trespass* § 86 provides:

> It does not seem to be clear, however, that although every trespass which is a disturbance of the peace is indictable, every trespass which is the subject of a civil action is not an indictable offense. To constitute the offense of criminal trespass, intentional acts must be used, or a wilful demonstration of force calculated to intimidate or alarm, or acts involving or tending to a breach of the peace. A mere invasion of private property without a disturbance of the peace is not a crime. However, although there is authority for the opposite view, it is usually held that even though an entry on premises is effected peaceably, if thereafter violent and abusive language is used and acts done reasonably calculated to intimidate or lead to a breach of the peace, the entrant is guilty of forcible trespass.

I have no quarrel with the right of a proprietor of a business in denying entrance to anyone undesirably dressed. Some formality in certain restaurants is rightfully expected — shoes and a shirt are the usual requirement for most establishments. Neither should any proprietor be required to endure disruptive conduct by a customer, however slight. But to be able to eject a customer or invitee for no such reason at any whim of the proprietor and make the refusal to leave a crime is going too far. The law does not permit such subjective determinations of criminal conduct. *Lloyd Corp.* v. *Tamer*, 407 U.S. 551 (1972), cited by the majority, is perfectly sound. The reason for no handbills was to prevent annoyance of customers, prohibit litter and avoid potential disturbances. The decision was made on a First Amendment basis.

Actually this case is somewhat ridiculous. It is not unlawful to enter a Walmart Store, hurriedly memorize the price of several items, run outside and write them down, and

return innumerable times to repeat this comic performance; it is only the writing down that is prohibited. What about mumbling quietly into a hidden tape recorder? The statute allows a merchant to subjectively decide what is undesirable criminal conduct. It is entirely too subjective for constitutional standards. I would reverse and dismiss.

JOHN I. PURTLE, Justice, dissenting. This case should never have been classified as a criminal case except for the enactment of such an absurd law. Arkansas Stat. Ann. § 71-1803 (Repl. 1979) is not even in the criminal code and rightfully so. This statute was a part of Act 169 of 1959 and is clearly a segregation statute. The statute is too broad to be understood by lawyers, judges or the public. Clearly it authorizes the management of a business to order out and/or have arrested people with grey hair, loud clothing, black hair, subdued clothing or black skin, or a person or persons wearing beads, crucifixes or gold earrings. If a person refused to call the owner "boss" or "your honor" he would be subject to these penal sanctions. How much broader could a law be? Whether argued by the parties properly or not, it is *plain error* not to strike down such a statute. It is our duty to do so when the trial court fails to do so.

I agree with that part of the majority opinion which states: "As will be seen from the facts, the real dispute is between K-Mart and Wal-Mart." Competitive pricing should be encouraged, not discouraged. That is the free enterprise way of doing things in America. Incidentally, the action upheld here is a denial of appellants' first amendment rights. Apparently the statute and this court will allow memorization of the prices of one's competitor but not the simple recordation of them while on his property. This statute is clearly a vestige of segregation and should be struck down by this court here and now. The criminal code, Ark. Stat. Ann. § 41-2004 (Repl. 1977) obviously supersedes this statute, and it defines criminal trespass in a manner clearly understandable.

I would reverse and dismiss.

P. A. HOLLINGSWORTH, Justice, dissenting. The ma-

jority overlooks the fact that the 1964 Civil Rights Act prohibits the enforcement of § 71-1803. The order to leave the store was given by a private party, for "private" reasons. The majority is allowing state action to enforce a private decision. The majority is in error in allowing a business, under color of state law, to enforce private infringement of federally protected rights.

The trial court remarked that § 71-1803 was enacted in 1959 in the days of the walk-ins and sit-ins. It is apparent that the legislature was enacting a statute that was intended to punish blacks that entered public places in Arkansas and enjoyed the same privileges as white patrons. This was the sole purpose of the statute. It is acknowledged that § 71-1803 is susceptible to overbroad interpretation and if the appellants had been black, they probably would not have been charged with refusing to leave a public place. It is argued that since no proof of racial discrimination is offered, the defense of overbreadth is inapplicable.

The majority applies the wrong test for deciding whether a statute overreaches federally protected freedoms. To challenge a statute as facially void due to overbreadth, a defendant charged under the statute need not show that its application deprived him of any such right. It is enough to show that the application may interfere with protected federal rights. *Aptheker* v. *Sec. of State,* 378 U.S. 500, 515-516 (1964).

It is the possibility that the individual will suffer the infringement rather than arrest that justifies a constitutional challenge by the mere showing of possible interference with protected federal rights. In one of the landmark cases of the civil rights era, the U.S. Supreme Court stated, "a decree may be invalid if it prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct. For in appraising a statute's inhibitory effect upon such rights, this Court has not hesitated to take into account possible application of the statute in other factual contexts besides that at bar." *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 432 (1963).

I am persuaded that the statute should be struck down and the trial court should be reversed.