**Thomas E. CROWDER, Jr., Plaintiff–Appellant, B. Mae Miller, Dorothy Maddox, Plaintiffs,**

v.

**HOUSING AUTHORITY OF THE CITY OF ATLANTA, Samuel A. Hider, Doris Alexander, W.H. Mays, Each in their Individual and Official Capacities, Defendants–Appellees.**

**No. 91–9008.**

United States Court of Appeals,
Eleventh Circuit.

May 7, 1993.

See also, 908 F.2d 843.

588

Thomas M. Byrne, Sutherland, Asbill & Brennan, Atlanta, GA, for plaintiff-appellant.

Nina Hickson Perry, Mack & Bernstein, Ira P. Bernstein, Atlanta, GA, for defendants-appellees.

Before HATCHETT, EDMONDSON and BIRCH, Circuit Judges.

EDMONDSON, Circuit Judge:

This case is about the rights of a public housing tenant to use common areas in his building for group Bible study. At trial, a jury found that none of the Atlanta Housing Authority ("AHA") management's restrictions violated the tenant's First Amendment rights. The District Court rejected the tenant's later motion for a judgment notwithstanding the verdict, and the tenant appeals. Because we conclude that some of management's acts did violate the tenant's First Amendment rights, we REVERSE in part, AFFIRM in part, and REMAND for a determination of damages.

## I. Facts and Background [1]

Thomas Crowder ("Crowder") lived in a public housing apartment building owned and operated by AHA.[2] During his stay, Crowder attempted to hold Bible study meetings using the building's common facilities. His efforts met with a hostile reaction from some tenants and from the building's management.

Crowder wanted to use the building's auditorium and the adjacent library. Auditorium activities included, among other things, ceramics classes, bingo games, political speeches, and Sunday afternoon religious services. The adjacent library, which contained tables and chairs, could be used as an alternative meeting place. Doris Alexander ("Alexander"), the building manager, controlled the access to these facilities and made certain that no scheduling conflicts arose. For the most part, the tenants encountered no difficulties in using these facilities.

Like Crowder, most of the residents were elderly or disabled. The residents were concerned about their safety, and some were afraid to leave their apartments in the evenings and at night. The building doors remained locked, and no guests were permitted to enter the building before 8:30 a.m.

For several weeks in 1986, Crowder held Bible studies in the auditorium. Some tenants complained about the way Crowder promoted these meetings, in particular Crowder's habit of widely posting notices and slipping notices under tenants' doors—whether or not the respective tenants had shown interest in Bible studies. No evidence shows, however, that these Bible study meetings themselves disrupted the normal activities of other people in the building. Alexander prohibited these studies because of scheduling problems and concerns about tenant safety. Crowder objected to the ban. Months later, William Sheals, Alexander's supervisor, told Crowder that Crowder would have to obtain majority approval at a tenants' meeting to resume his Bible studies. Nothing sug-

---

1. We state the disputed evidence in the light, and with all reasonable inferences, most favorable to defendant-appellees. We have reviewed the record independently and conclude that this set of evidentiary facts is one that could be found constitutionally, with no forbidden intrusion on the field of free expression. *See generally Bose Corp. v. Consumers Union,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (stressing need to review factfinding independently in First Amendment cases).

2. Because of Crowder's death in October 1991, the District Court substituted his son, Thomas Crowder, Jr., for the older Crowder.

gests that any other tenant's right to use common facilities required such an affirmative vote.

In October 1986, the required tenant meeting took place. There is considerable dispute over exactly what was decided at this meeting. Crowder claims that the tenants approved his resolution to hold Bible studies in the auditorium, so long as there was no conflict with other planned events. The management, on the other hand, claims that the tenants allowed Crowder to hold Bible studies on Friday nights only.[3] Crowder objected to the Friday-night-only restriction.

On Monday, December 8, 1986, at 11:00 a.m., Crowder attempted to hold a one-hour Bible study in the library. The record indicates that Crowder's meeting that day was interfering with other tenants' preparation for a scheduled Christmas party in the auditorium: furniture from the auditorium was being moved to the library for storage. Anticipating trouble, Crowder tape-recorded the events of that day. The tape recording indicates that Alexander, Roosevelt Profit, the building's director of security, and W.H. Mays, an Atlanta policeman, directed Crowder to stop the Bible study and to leave the library.[4] These three people informed Crowder that he could have his Bible study on Friday nights only and that, if he wanted to hold a Bible study at other times, he would have to hold it in his room. Crowder insisted on his right to hold his Bible study, then and there. Mays arrested Crowder, but did not take him to jail. Instead, Mays gave Crowder a summons to appear in Atlanta Municipal Court on a charge of "violation of lawful order to

leave." The next day, the Atlanta Municipal Court dismissed the charge.[5]

Crowder later filed this action for damages and other relief. At trial, the District Court rejected Crowder's request for a directed verdict on the issue of First Amendment liability. The jury found that none of management's actions violated Crowder's First Amendment rights.[6] The District Court denied Crowder's later motion for a judgment notwithstanding the verdict.

Crowder appeals, contending that the District Court applied the wrong First Amendment standards to the common facilities and to management's actions.

## II. The Common Facilities

The Supreme Court has defined several kinds of government-owned property for First Amendment purposes: the traditional public forum, the designated public forum, and the nonpublic forum. *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45–46, 103 S.Ct. 948, 954–955, 74 L.Ed.2d 794 (1983). Traditional public fora generally include public streets and parks. Designated public fora are created when the government opens property to the public for expressive activity and are subject to the same standards as traditional public fora. In traditional or designated public fora, the state may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication." *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 955; *Sentinel Commu-*

---

3. Nights were an unfavorable time for meetings, because many residents went to bed early or were afraid to leave their apartments at night.

4. Alexander earlier had called defendant-appellee Samuel Hider, chairman of the AHA, who dispatched Profit to the building with the police.

5. Briefly stated, Crowder alleges that his fellow residents shunned him after his arrest and that the stress of these events caused his health to deteriorate. Because the jury found no First Amendment violation, it never reached the damages issue.

6. The verdict form did not include special interrogatories aimed at specific fact-finding. The jury simply found that there had been no First Amendment liability under 42 U.S.C. § 1983.

We recommend the use of special interrogatories to establish what evidence the jury credits or discredits in First Amendment cases. We observe here, however, that plaintiff's counsel did not request special interrogatories and that, when the district judge raised the subject of special interrogatories, plaintiff's counsel opposed their use.

*nications Co. v. Watts,* 936 F.2d 1189, 1201, 1202 (11th Cir.1991). A nonpublic forum is "[p]ublic property which is not by tradition or designation a forum for public communication," and limits on access to such a forum must meet only a reasonableness standard. *Perry,* 460 U.S. at 46, 103 S.Ct. at 955.

■ One kind of designated public forum is the limited public forum. *Perry,* 460 U.S. at 46 n. 7, 103 S.Ct. at 955 n. 7. A limited public forum is a forum for certain groups of speakers or for the discussion of certain subjects. *Id.; Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981) (student groups have First Amendment right of equal access to university facilities); *City of Madison Joint School District v. Wisconsin Public Employment Relations Comm'n,* 429 U.S. 167, 175, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976) (teachers have right to speak on contract at school board meeting, which is a limited public forum for subjects relating to operation of district's public schools). *See also Searcey v. Crim,* 815 F.2d 1389, 1391 (11th Cir.1987) (discussing three kinds of government-owned property for First Amendment purposes). The government may restrict access to limited public fora by content-neutral conditions for the time, place, and manner of access, all of which must be narrowly tailored to serve a significant government interest. *Perry,* 460 U.S. at 45–46, 103 S.Ct. at 955. A restriction which vests unlimited discretion in a government actor, however, opens the way to arbitrary suppression of particular points of view. Such arbitrariness is "inherently inconsistent with a valid time, place, and manner regulation." *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 2565, 69 L.Ed.2d 298 (1981); *Miami Herald Pub. Co. v. City of Hallandale,* 734 F.2d 666, 675–76 (11th Cir.1984) (holding city licensing ordinance unconstitutional because it gave officials unchecked discretion to prevent newspaper distribution).

■ The District Court concluded, and instructed the jury, that the auditorium was a limited public forum for tenants.

We agree. Management opened the auditorium to a wide range of expressive activities, including ceramics classes, political speeches, and religious services. As a result, the auditorium here corresponds to the university facilities held to be a public forum in *Widmar.*

■ The District Court concluded that the library was no public forum because it was not ordinarily used for expressive purposes. Crowder contends that the library should have been treated as a limited public forum because it was a common facility available to the tenants and was an alternative meeting site to the auditorium. The record, however, does not show that tenants regularly or frequently met in the library. Irregular and infrequent use does not transform a common facility into a public forum for expressive group meetings. We agree that the library was a nonpublic forum. *See Perry,* 460 U.S. at 47, 103 S.Ct. at 956 (selective access does not transform government property into a public forum); *United States v. Gilbert,* 920 F.2d 878, 885 (11th Cir.1991) (isolated First Amendment use of government-owned portico does not create a public forum).

### III. Management Actions

#### A. The Bible Study Prohibition

■ Alexander prohibited Crowder from using the common areas for Bible studies from July 1986 to October 1986. She placed no comparable restrictions on other tenants or other uses. Alexander justifies these restrictions on the grounds that Crowder's use of the facilities created security problems and that she needed to avoid scheduling conflicts. Neither defense suffices.

■ Alexander claims that Crowder invited a nonresident to some early (7:00 a.m.) Bible studies. Because apartment security rules did not allow nonresidents to enter the building before 8:30 a.m., Alexander then prohibited the Bible studies themselves. Although valid "time, place, and manner" restrictions need not be the least restrictive possible, *Messer v. City of*

*Douglasville,* 975 F.2d 1505, 1513 (11th Cir. 1992) (regulations ensuring the removal of temporary signs are permissible, even if less restrictive regulations were possible), we conclude that in the circumstances of this case Alexander's complete ban was not narrowly tailored to meet her stated security concerns.[7]

■■■ Alexander also argues that she needed to retain discretion over facility allocation to avoid scheduling conflicts. The building's common facilities were not in constant use, however.[8] As a result, scheduling considerations could not justify a complete ban.

The complete ban on Bible studies under the circumstances violated the First Amendment.[9]

### B. The Majority Vote Requirement

■■■ Because Crowder continued to insist on his right to hold meetings, the management then required him to obtain majority approval for access to the common facilities for his group Bible studies.

■■■ The right to free speech in a limited public forum may not be made contingent on majority approval. By their very nature, constitutional rights may be asserted by individuals against hostile majorities. "One's right to ... free speech ... to freedom of worship and assembly ... may not be submitted to vote." *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities."). *Cf. Larkin v. Grendel's Den, Inc.,* 459 U.S. 116, 122, 103 S.Ct. 505, 509–510, 74 L.Ed.2d 297 (1982) (government power to approve zoning decisions improperly delegated to private actors). The management violated Crowder's First Amendment rights by making them contingent upon majority approval, especially where the tenants were totally unguided by objective standards.[10] Here, the tenant majority was left free to make a decision based purely on the content of the speech associated with Bible studies.

### C. The Friday–Night–Only Limitation

■■■ After the October 17 tenants' meeting, management limited Crowder's access to common facilities, for the purpose of Bible studies, to Friday nights. Even if this were a content-neutral restriction relating to the time, place, and manner of access, the Friday-night-only restriction still must be narrowly tailored to serve a significant government interest. *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55.

The minutes of the tenant meeting indicate the Tenant Association or its President set the Friday night time, over Crowder's objections. Although Crowder also objected to management about the Friday-night-only rule, the building management accepted the limitation. With its Friday-night-only rule, management completely barred Crowder's daytime use of the common fa-

---

7. Although neither a rule prohibiting early morning Bible studies nor a rule prohibiting nonresident guests at Bible studies would be the least restrictive possible, either of these two rules would have been more tailored to the stated security concerns, and such regulations therefore might meet the requirement that regulations not "burden substantially more speech than is necessary to further the government's legitimate interest." *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989).

8. The record indicates that these facilities were used only several hours a week. Crowder did not seek to displace previously scheduled activities.

9. The management does not argue that it completely withdrew Crowder's facility access rights for group Bible studies as a temporary, therapeutic remedy for his building curfew violations. We do not decide whether management might have lawful authority to impose on Crowder some kind of exemplary suspension for his rule violations that would be in addition to its ordinary authority to set reasonable time, place and manner regulations.

10. No evidence in the record indicates that the times during which the common facilities could be used for meetings were scarce. We do not discuss whether management could allocate user time for *scarce* common facilities in proportion to the number of tenants interested in the various activities competing for the limited time and space.

cilities for Bible studies. The evidence at trial was that tenants were most likely to attend daytime activities and that Crowder wished to hold daytime Bible studies. Management failed to set forth an explanation for prohibiting daytime meetings. Because the facilities were not in constant use during the daytime, the Friday-night-only rule was not narrowly tailored to serve the substantial government interest in avoiding scheduling conflicts. *See* note 8, *supra*.[11]

■ The management also argues that Crowder could have held the Bible study in his apartment at times other than Friday nights. But the existence of an alternative forum does not provide an independent basis for restricting speech, absent a content-neutral, narrowly tailored regulation. *Schneider v. New Jersey*, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939) ("one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place"); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 70 n. 15, 103 S.Ct. 2875, 2882 n. 15, 77 L.Ed.2d 469 (1983); *Knights of K.K.K. v. East Baton Rouge Parish School Bd.*, 578 F.2d 1122, 1126 (5th Cir.1978) (K.K.K. could not be denied access to school facilities on the basis that other facilities for holding meetings were available).

The Friday-night-only restriction violated Crowder's First Amendment rights.

### D. The Arrest

■ On Monday, December 8, 1986, police officer Mays arrested Crowder for using the library for a Bible study meeting. The AHA management says that it requested the police action because Crowder was interfering with preparations for a tenant Christmas party that had been sched-uled earlier. Evidence supports management's position that the library was needed, on that particular day, to store furniture. The District Court correctly concluded that the library was no public forum for meetings; so management's act to stop the meeting, under the circumstances of this case, was reasonable and lawful.

■ But even if the library were a limited public forum as Crowder contends, a prohibition on conflicting uses might be a proper "time, place, and manner" restriction. *See generally Grayned v. City of Rockford*, 408 U.S. 104, 115–116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (government has a significant interest in avoiding conflicting uses of facilities); *Miami Herald*, 734 F.2d at 673 (reasonable "time, place, and manner" regulations may be necessary to further significant government interests, and are permitted). Evidence showed that it was the practice of the building management to schedule the use of common facilities (that is, reserve space and time) to avoid conflicting uses.[12] From the record, the jury could infer that management generally scheduled uses of facilities on a "first come, first served" basis: a permissible content-neutral restriction.[13] A jury reasonably could have found—and, again, our own independent examination of the record satisfies us that such a finding would be consistent with constitutional concerns—that Crowder's activities that day were interfering with previously scheduled Christmas party preparations and the storage of the auditorium furniture in the library. Even if the library restrictions would have to withstand the scrutiny applicable to public fora (and the restrictions do not, because the library was no public forum), there was no First Amendment violation with the arrest.[14]

---

**11.** We do not reach the question whether a general rule allowing no single tenant or tenant group to use common facilities more than once per week for meetings would be a permissible "time, place, and manner" restriction.

**12.** The evidence shows some exceptions to this practice. Some users of the auditorium did not preschedule with management, and the management did not interfere with such users if no conflict in fact resulted.

**13.** Crowder never claimed that he had a right to interfere with others' earlier scheduled uses of facilities.

**14.** Because the evidence of Hider's and Mays' involvement was limited to events surrounding Crowder's arrest, we conclude that these two defendants have no liability in this case and affirm the judgment in their favor.

**594**

#### IV. Conclusion

Housing authority officials will draw some warning from today's decision. But nothing we decide today limits the legitimate power of public housing managers, working with public housing tenants if the managers choose, to establish reasonable time, place, and manner regulations. Nor do we prohibit management from excluding First Amendment tenant activities that violate reasonable rules or that substantially interfere with the other tenants' quiet enjoyment of their homes.[15]

We AFFIRM the District Court's judgment and its denial of Crowder's motion for a judgment notwithstanding the verdict in connection with the events surrounding Crowder's arrest. We REVERSE the District Court's judgment and conclusions on the First Amendment liability issues on Bible study prohibition, the majority vote requirement and the Friday-night-only rule. We REMAND for a determination of damages from the AHA and Alexander, in her official capacity.

---

**15.** Plaintiff argues that the validity of a time, place, and manner restriction is *never* a jury question. He says that the District Court erred in allowing the jury here to decide whether defendants' restrictions on Crowder's meetings were justified without regard to the content of Crowder's speech, served a significant government interest, and left open alternate channels for communication.

We do not decide whether such matters might ever properly be jury questions. Considering the record in this case, the plaintiff was entitled—under ordinary Federal Rules standards (and even more in the light of *Bose*'s admonition to judges about mixed questions of law and fact)—to a judgment as a matter of law on most of his constitutional claims. For the library arrest, the jury was not instructed to make a time, place, and manner determination, given the District Court's earlier conclusion that the library was no public forum for meetings.