The Honorable Jim Hendren State Representative Route 1, Box 260 Sulphur Springs, Arkansas 72768
Dear Representative Hendren:
This is in response to your request for an opinion, on behalf of a constituent, regarding the circulation of initiative and referendum petitions. You indicate that an individual placed a card table outside the door of the Bella Vista Library and, during two business days, solicited signatures on several petitions regarding referendums to be placed on the state ballot. You also indicate that the Bella Vista Library is not funded by any city, county, or state, rather the Bella Vista Property Owners directly fund the library. Specifically, you request an opinion regarding the following two questions:
 1. Can the Bella Vista Library prohibit or restrict petitioners from utilizing their property for political activities?
2. What is the proper procedure to adopt such guidelines, if possible?
In my opinion, these questions cannot be definitively answered in this opinion because they will require factual determinations, which are beyond the scope of an attorney general's opinion. The Bella Vista Library, however, may at the very least impose regulations on the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication.
This office has issued two previous opinions regarding the collecting of initiative and referendum signatures (Op. Att'y Gen. Nos. 91-307 and 90-221), which I am enclosing for your review. We have recognized that the collecting of signatures on petitions is a form of speech which is protected under the First Amendment. See Op. Att'y Gen. Nos. 91-307 and 90-221; see also United States v. Cruikshank, 92 U.S. 542 (1875). This office, however, has also recognized that we cannot provide a definitive answer to the types of questions you have presented because a definitive resolution will require factual determinations that are not within the scope of an attorney general's opinion. See Op. Att'y Gen. No. 90-221. Consequently, we may only set out the relevant constitutional tests and engage in a general discussion of the legal framework in order to offer guidance in addressing the factual analysis of each situation.
The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech . . ." See City of Ladue v. Gilleo, 512 U.S. ___,129 L.Ed.2d 36 (1994). The Fourteenth Amendment makes this limitation applicable to the States and to their political subdivisions. Id. The limitations of the First and Fourteenth Amendments, however, are not applicable to actions by the owner of private property used only for private purposes. Central Hardware Co. v. NLRB, 407 U.S. 539 (1972); seealso Acklin Ford Co. v. Cordell, 274 Ark. 341, 625 S.W.2d 459 (1981). Nevertheless, the United States Supreme Court has recognized that while state statutes and constitutions may not impinge upon federal constitutional rights, states have the authority to adopt in their own constitutions or statutes individual liberties more expansive than those conferred by the federal constitution. Pruneyard Shopping Center v.Robins, 447 U.S. 74 (1980). Thus, with regard to private property used only for private purposes, it must be determined whether the Arkansas Constitution provides safeguards that protect the "speech" at issue.
The Arkansas Constitution contains several provisions which provide pertinent safeguards regarding the circulation of initiative and referendum petitions. Arkansas Constitution Art. 2, § 4 provides: "The right of the people peaceably to assemble to consult for the common good, and to petition, by address or remonstrance, the government, or any department thereof, shall never be abridged." Article 2, § 6 provides in part: "The liberty of the press shall forever remain inviolate. The free communication of thoughts and opinions is one of the invaluable rights of man; and all persons may freely write and publish their sentiments on all subjects, being responsible for the abuse of such right." Finally, Amendment 7 provides in part:
 Unwarranted Restrictions Prohibited — No law shall be passed to prohibit any person or persons from giving or receiving compensation for circulating petitions, nor to prohibit the circulation of petitions, nor in any manner interfering with the freedom of the people in procuring petitions; but laws shall be enacted prohibiting and penalizing perjury, forgery and all other felonies or other fraudulent practices in the securing of signatures or filing of petitions.
These safeguards were addressed in Opinion No. 90-221 where this office stated that "it is my best legal judgment . . . that assuming theFirst Amendment to the United States Constitution grants no constitutional protections for the exercise of initiative and referendum signature collecting on private property, our own state constitutional provisions will likely not either." The discussion in that opinion will not be set out in detail in this opinion, as it is attached for your review. It should be noted, however, that this office opined that Arkansas Constitution Art. 2, §§ 4 and 6, and Amendment 7 are intended to provide protections against the actions of the government, and not the actions of a private landowner seeking to exclude others from his property. See Op. Att'y Gen. No. 90-221. This office also opined that the strong language of Arkansas Constitution Art. 2, § 22 contributed to the conclusion. Article 2, § 22 provides in part: "The right of property is before and higher than any constitutional sanction."
In my opinion, the conclusion in Opinion No. 90-221 is also supported byCulhane v. State, 282 Ark. 286, 668 S.W.2d 24 (1984). In Culhane, two employees of a K-Mart discount store were arrested and charged with a misdemeanor for refusing to leave a Wal-Mart discount store after being asked by the store manager to leave. The court recognized that Wal-Mart invites the public to come to its store to shop and make purchases. The court, however, relied upon Lloyd Corp. v. Tanner, 407 U.S. 551 (1972), to conclude that Wal-Mart could prohibit a person from exercising in its store what would be a protected right of free speech if asserted on a public sidewalk. Consequently, the court stated that Wal-Mart could certainly prohibit a competitor from remaining in the store not to enjoy a constitutional right but solely to gather information enabling the competitor to take business away from Wal-Mart. In recognizing that under the United States Constitution Wal-Mart could prohibit a person from exercising in its store what would be protected speech if asserted on a public sidewalk, the court never considered that our constitution might still prohibit such action.
However, even though the Bella Vista Library is privately funded, it may nevertheless be required to honor First Amendment rights if its property is sufficiently devoted to public uses. See Marsh v. Alabama,326 U.S. 501 (1946). Although the First and Fourteenth Amendments are limitations upon state action, under some circumstances a private party may be converted into a "state actor." See Lugar v. Edmonson Oil Co.,457 U.S. 922 (1982). Property, however, does not lose its private character merely because the public is generally invited to use it for designated purposes. Lloyd Corp. v. Tanner, 407 U.S. 551 (1972). "Before an owner of private property can be subjected to the commands of the First andFourteenth Amendments the privately owned property must assume to some significant degree the functional attributes of public property devoted to public use." Central Hardware Co. v. NLRB, 407 U.S. 539 (1972). Again, this question will necessarily require a factual determination.See Lugar, supra. Specifically, this question may be dependent upon the characteristics of Bella Vista itself.
In Marsh v. Alabama, 326 U.S. 501 (1946), the United States Supreme Court addressed a comparable question, and the Court stated that whether a corporation or a municipality owns or possesses the town, the public in either case has an identical interest in the functioning of the community in such manner that the channels of communication remain free. Grace Marsh, a Jehovah's Witness, attempted to distribute religious literature upon a sidewalk in the town of Chickasaw, Alabama. The town was owned by the Gulf Shipbuilding Corporation; however, "[e]xcept for that it has all the characteristics of any other American town." The Court noted that the property consisted of residential buildings, streets, a system of sewers, a sewage disposal plant, and a "business block" upon which business places were situated. In the stores of the town, the corporation posted notices that "This is private property" and no solicitation was permitted without a permit. Marsh was arrested, and she was charged with violating an Alabama statute which made it a crime to enter or remain on the premises of another after having been warned not to do so.
The Court noted that had the title to Chickasaw belonged to a municipal corporation rather than to a private corporation, and had Marsh been arrested for violating a municipal ordinance rather than a ruling by those appointed by the corporation to manage the company town, it would have been clear that her conviction must be reversed. In any event, the Court concluded that:
 [T]he circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute.
The Court's holding has also been summarized as follows:
 [W]here private interests were substituting for and performing the customary functions of government, First Amendment freedoms could not be denied where exercised in the customary manner on the town's sidewalks and streets.
Lloyd Corp. v. Tanner, 407 U.S. 551 (1972). In reaching its decision, the Court emphasized that the town of Chickasaw did not function differently from any other town.
In Lloyd Corp., the Court narrowly construed Marsh and concluded that a privately owned and operated shopping center had not been sufficiently dedicated to public use as to require the owners to allow the distribution of handbills unrelated to the shopping center's operation.See also Hudgens v. NLRB, 424 U.S. 507 (1976). The court noted thatMarsh:
 involved the assumption by a private enterprise of all of the attributes of a state-created municipality and the exercise by that enterprise of semi-official municipal functions as a delegate of the State. In effect, the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case, there is no comparable assumption or exercise of municipal functions or power. (Emphasis supplied.)
The Supreme Court has stated that only by sifting facts and weighing circumstances can it be determined whether the reach of theFourteenth Amendment extends to a particular case. See Evans v. Newton,382 U.S. 296 (1966). Consequently, the question of whether Bella Vista has all the characteristics of any other American town such that it has assumed to some significant degree the functional attributes of public property devoted to public use will require a factual determination.
Based upon Marsh v. Alabama, the Bella Vista Library would in all likelihood be held to the same standards as a government-owned library, even though it is privately funded by the Bella Vista Property Owners.Cf. Morris v. Medin, 43 Ark. App. 29, 858 S.W.2d 142 (1993). ForFirst Amendment purposes, the United States Supreme Court has defined three types of government-owned property: the traditional public forum, the designated public forum, and the nonpublic forum. Perry Education Assn.v. Perry Local Educators' Assn., 460 U.S. 37 (1983). Traditional public fora are generally places that have historically been associated with the free exercise of expressive activities, such as streets, sidewalks, and parks. United States v. Grace, 461 U.S. 171 (1983); Perry, supra.
Designated public fora are created when the government opens property to the public for expressive activity for a limited period of time, a limited topic, or a limited class of speakers. Forbes v. ArkansasEducational Television, 22 F.3d 1423, cert. den. 115 S.C. 500, 1962 (8th Cir. 1994); Crowder v. Housing Authority of City of Atlanta, 990 F.2d 586
(11th Cir. 1993). In traditional or designated public fora, the state may enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication. Perry, supra. In order for the State to enforce a content-based exclusion, it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. Id. A nonpublic forum is public property which is not by tradition or designation a forum for public communication. Id. In addition to time, place, and manner regulations, the State may reserve the nonpublic forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. Id. Because the character of the property at issue determines the standards by which limitations on speech must be evaluated, a definitive resolution requires a factual determination.
In a case which predated the Perry framework, the United States Supreme Court recognized that a public library is a public facility in which members of the public are entitled to exercise freedom of speech. SeeBrown v. Louisiana, 383 U.S. 131 (1966). The Court recognized that a State or its instrumentalities could regulate the use of libraries, but "it must do so in a reasonable and nondiscriminatory manner, equally applicable to all and administered with equality to all." Id.
Subsequently, the Court commented that although a silent vigil may not unduly interfere with a public library, making a speech in the reading room almost certainly would. Grayned v. City of Rockford, 408 U.S. 104
(1972).
Since the Perry decision was announced, several courts have applied the tripartite framework to libraries. In Crowder v. Housing Authority ofCity of Atlanta, 990 F.2d 586 (11th Cir. 1993), the court concluded that a public housing apartment building's library was a nonpublic forum. The court noted that the record failed to establish that the tenants regularly or frequently met in the library. The court concluded that irregular and infrequent use does not transform a common facility into a public forum for expressive group meetings. In Kreimer v. Bureau of Policefor Town of Morristown, 958 F.2d 1242 (3rd. Cir. 1992), the court determined that a public library was a limited public forum — a type of designated public fora. See also Concerned Women v. Lafayette Cty. Oxford Pub.L. 699 F.Supp. 95 (N.D.Miss. 1988) (library's practice of allowing diverse groups to use auditorium opened forum to the general public with certain restrictions prohibiting any disruptive type meetings). The court concluded that the library was open to the public only for specified purposes: reading, studying, and using the library materials. The court also noted that the library did not open its doors for the exercise of all First Amendment activities. Further, the court commented that the very purpose of a library is to aid in the acquisition of knowledge through reading, writing, and quiet contemplation, and the exercise of other oral and interactive First Amendment activities is antithetical to the nature of the library. Similarly, in ConcernedWomen, supra, the court stated that having created a public forum, the library could not restrict access to its auditorium based upon religious content of a group's meeting, but the library had the authority to establish reasonable time, place, and manner regulations and deny access to groups who would disrupt the general use of the library.
Having concluded that the United States Constitution provides safeguards to protect speech in government-owned property, we must still determine whether the Arkansas Constitution provides greater protection. In Opinion No. 90-221, this office concluded that with respect to "public forums," where protection is provided under the First Amendment, the Arkansas Supreme Court would construe Arkansas Constitution Art. 2, §§ 4 and 6, and Amendment 7 as coextensive with the First Amendment. Thus, in my opinion, if the Bella Vista Library satisfies the requirements of the United States Constitution as to any applicable free speech rights of its patrons, it will be in compliance with the pertinent provisions of the Arkansas Constitution.
As to the proper procedure for adopting appropriate guidelines, this will again involve a factual determination. The Bella Vista Property Owners, as owners of the library, would have the authority to establish regulations. See Marsh, supra. Also, the property owners may well have appointed a group to manage the town. Further, depending upon the circumstances under which the library is operated, the library director or even a governing board, if one exists, could have the authority to establish restrictions. In order to definitively answer this question, I would be required to speculate as to the organization of both Bella Vista and the Bella Vista Library.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Warren T. Readnour.
Sincerely,
WINSTON BRYANT Attorney General
WB:WTR/cyh